FILED

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

2006 SEP 19  P 3: 02

CLERK US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

In re:

**ARTHUR I. JACOBS,**
    **Debtor.**


**UNITED STATES OF AMERICA**
    **Appellant,**

v.                                         **Case No. 3:05-cv-252-J-99-HES**
                                           **Bankruptcy Case No. 03-07148-BKC-3P7**
                                           **Adversary Pro. No. 04-00045**

**ARTHUR I. JACOBS,**
    **Appellee.**

_____


## ORDER

This matter is before the Court on an appeal of the United States of America to the

Findings of Fact and Conclusions of Law and Final Judgment of the United States Bankruptcy

Court for the Middle District of Florida discharging the tax liability of the Appellee, Mr. Arthur

Jacobs ("Mr. Jacobs"). The Bankruptcy Court held that the United States failed to proffer

sufficient evidence to establish that the debtor "willfully attempted in any manner to defeat" his

tax debts, thereby rendering those debts outside the scope of 11 U.S.C. § 523(a)(1)(C), and,

consequently, within the purview of the debtor's discharge. After carefully considering the

record, the briefs of the parties, and the applicable law, this Court reverses the Bankruptcy Court

for the reasons stated below.

## Background[1]

### I.

### A.

Mr. Jacobs is a real estate and transactional attorney who has practiced in Fernandina

Beach, Florida since 1972.  He formerly operated the law firm of Arthur I. Jacobs, P.A., which

filed for Chapter 7 bankruptcy protection in 1995, largely because the firm failed to pay federal

taxes which remain unpaid to this date. (Tr. at 30.)  After completion of the bankruptcy, Mr.

Jacobs established the law firm of Jacobs & Associates, P.A., of which he is the sole shareholder

and officer.  At the time of trial in the present case, Jacobs & Associates, P.A. was indebted to

the United States for delinquent income taxes in the amount of $56,000. (Tr. at 32.)

At issue in this case, are delinquent taxes owed for the years 1990 through 1995 and 1997

through 1998.  During the years 1990 through 1998, the debtor's adjusted gross income totaled

$2,032,358, and his tax liabilities totaled $375,334.90, exclusive of accrued interest and

penalties.  As of March 8, 2004, the total amount owed for the years in question was

approximately $800,000 (including penalties and interest), and Mr. Jacobs has voluntarily paid

only $199,616.33, leaving a balance exceeding $600,000.[2]  These amounts were self-assessed by

Mr. Jacobs.  However,  in each of the years in question, Mr. Jacobs sought an automatic

---

[1]The background provided is largely derived from the Bankruptcy Court's Opinion, however, the Court did consider the entire record to supplement its opinion.

[2]The United States provided the Court with a cryptic graph explaining the amounts owed as to years 1989-2001, which summarized Exhibits 7, 14, and 15, which were admitted at trial. (Br. for Appellant, at 7.)  However, the United States failed to provide an explanation as to how the chart could be used to render an accurate, more specific calculation of the amount owed. Furthermore, the United States failed to state in its brief, nor can the Court locate in the record, the amount of the Proof of Claim filed by the government in this case.  Accordingly, the Court cannot provide specific amounts and will state the amounts owed as mere approximations.

extension of time to file his tax returns and a second extension of time giving him until October

15th of the following year to file his return.  He failed to sufficiently satisfy the amount owed in

each of those years. (Tr. at 42.)  Although Mr. Jacobs could have had his various professional

associations pay him a salary, which would have required the firm to withhold taxes,  he chose to

do this only in 1994 and 1995. (Tr. at 38–39, 41.)  However, in 1995, only $9,362 was withheld,

which was only a minor portion of the taxes due on Mr. Jacobs' gross income of $233,510 for

that year. (Gov. Ex. 14.)

Mr. Jacobs married his current wife, Patricia Jacobs, who is not a debtor in the underlying

bankruptcy case, in 1990. (Tr. at 46.)  Mrs. Jacobs only brought household furnishings as assets

into the marriage. (Tr. at 46.)  There is also no indication that Mrs. Jacobs earned any significant

amount of income during the marriage. (Tr. at 47.)  During the settlement of an avoidance action,

the Chapter 7 Trustee asked that Mr. and Mrs. Jacobs prepare a schedule of Mrs. Jacobs' marital

assets. (Tr. at 48–49, 61.)  Mrs. Jacobs' marital assets were listed as follows: (1) one home

located at 15 Red Maple Road, Amelia Island, Florida, valued at $660,000;[3] (2) household

furnishings valued at $3,500; (3) jewelry valued at $11,000; and (4) one mink coat valued at

$800. (Gov. Ex. 34.)

From 1997 through March 2001, Mrs. Jacobs owned and operated a small jewelry store

located in Fernandina Beach called Morton-Jacobs Jewelers, Inc. (Tr. at 50.)  Mrs. Jacobs was

the sole shareholder, officer and director of the corporation. (Tr. at 55.)  During the four years of

its operation, Morton-Jacobs Jewelers never made a profit. (Tr. at 58.)  In March of 2001, Mrs.

Jacobs sold all of the assets, inventory, and good-will of the business for $80,000. (Tr. at 50–51.)

---

[3]Mr. Jacobs testified that the value of the home was closer to $800,000. (Tr. at 69.)

Mr. and Mrs. Jacobs filed joint tax returns for the years 1998-2001. (Gov. Exs. 7–12.) Although Mrs. Jacobs' occupation is listed as "storeowner," she did not report any earned income during those years. However, she reported a dividend from Morton-Jacobs Jewelers, Inc. of $22,321 on the couple's joint 2001 return, which was filed after the sale of the business in March 2001. (Gov. Ex. 12; Tr. at 54–55.)

From January 5, 1998, through July 3, 2000, Mr. Jacobs or his corporations wrote checks payable to Morton-Jacobs Jewelers, Inc. totaling $47,312. Mr. Jacobs personally wrote checks on his individual bank account totaling $8,400 in 1999 and 2000. (Gov. Ex. 28.) Checks were also drawn against the operating account for a firm named Jacobs & Peters, P.A. for the years 1998 and 1999, and made payable to Morton-Jacobs, Inc. in the amount of $31,500.[4] (Gov. Ex. 28.) Checks were also drawn on Jacobs & Associates, P.A.'s operating account and made payable to the jewelry store from 2000 through 2003 totaling $7,412. (Gov. Ex. 28.) Of the monies paid to the store, $40,150 was paid about three months prior to the sale of the store. (Tr. at 61–62.) In his testimony, Mr. Jacobs characterized these payments as "loans." (Tr. at 57–58.) These "loans" were never repaid. (Tr. at 58.)

Mr. Jacobs further testified that he and his law firm had made other payments to Mrs. Jacobs, and/or Morton-Jacobs Jewelers, Inc., totaling $119,056.87. (Tr. at 58.) Mr. Jacobs likewise characterized these payments as "loans," however, these monies were never repaid to either Mr. Jacobs or to Jacobs & Associates, P.A.[5] The $22,321 dividend that Mrs. Jacobs

---

[4]Jacobs & Peters, P.A. was the name of Mr. Jacobs' law firm prior to it being reorganized as the now bankrupt, Arthur I. Jacobs, P.A.

[5]Mr. Jacobs indicated that at least one promissory note was drafted and signed memorializing the existence of these loans. (Tr. at 62.)

4

received in 2001 following the sale of Morton-Jacobs Jewelers was never used to repay any of the loan amounts. (Tr. at 58.) Likewise, the $80,000 received from the sale of the business was never used to pay off the indebtedness. (Tr. at 59–60.)[6] Not coincidentally, Mrs. Jacobs also acquired much of her jewelry—which was valued at $11,000—from the store's inventory. (Tr. at 60.)

In addition to the loans that Jacobs & Associates, P.A., made to Morton-Jacobs Jewelers and Mrs. Jacobs, the firm also loaned money to Mr. Jacobs. (Gov. Exs. 16–27.) Specifically, the firm's 2002 Form 1120 reveals a transfer of $274,046 to Mr. Jacobs, which is characterized on the form as a $274,046 loan to shareholder. (Gov. Ex. 27.) After the IRS conducted an audit, Mr. Jacobs agreed to recharacterize this payment as taxable personal income. (Tr. at 94.)

Jacobs & Associates, P.A. has also made transfers to Mr. and Mrs. Jacobs to provide for their personal transportation. In 1996, the firm provided Mr. Jacobs with a 1996 Chevrolet Suburban. (Tr. at 76.)  In 1997, the firm paid for a new Chrysler minivan. (Tr. at 72), and in 2001 the firm paid for a new Chevrolet Suburban (Tr. at 75–76). Mrs. Jacobs is currently the title owner of a 2003 GMC Yukon valued at $39,137.20, which the firm continues to make monthly payments on totaling $756.77 per month. (Tr. at 74, 78.) No lease or rental agreement exists between Mrs. Jacobs and Jacobs & Associates, P.A. (Tr. at 78.) Mr. Jacobs represented that he uses this vehicle for both personal and business purposes. (Tr. at 75–78.)[7] In his

---

[6]These transactions also formed part of the factual basis of an avoidance action brought by the Chapter 7 trustee in the underlying bankruptcy case.  Mr. Jacobs settled that action for $50,000. (Tr. at 61.)

[7]Notwithstanding the stream of transfers between Jacobs & Associates, P.A., and its sole shareholder, Mr. Jacobs, and his wife, and the blurring of the line between corporate and personal expenditures, it is unclear from the record whether the chapter 7 trustee ever brought a veil-

testimony, Mr. Jacobs acknowledged that the Yukon was a luxury vehicle, and stated that he

needed such a vehicle to drive "back and forth from Fernandina to Tallahassee" in order to

"entertain folks in the legislative process." (Tr. at 77–78.)

Mrs. Jacobs also leases a Mercedes-Benz.[8] (Tr. at 85–86.)   The payments for this vehicle

total between $600 and $700 per month.  (Tr. at 86.)  Payments for this vehicle are made solely

by Mr. Jacobs. (Tr. at 86.)

## B.

In 1995, after five years of failing to satisfy his tax obligations, Mr. Jacobs and his wife

purchased a new home located on Amelia Island for $525,000. (Tr. at 66.)  The home is located

in a luxury-island golfing resort community named Amelia Island Plantation, located just ten

minutes from Fernandina Beach. (Tr. at 62–64.)  Residents of the resort enjoy a truly lavish

lifestyle and are treated to  such amenities as tennis courts, exclusive spas, boutique-style shops,

and a specialty grocery store. (Tr. at 63–64.)  When the couple bought the home, it was titled

solely in Mrs. Jacobs' name, however, both Mr. and Mrs. Jacobs became signatories and obligors

on the purchase mortgage loan. (Tr. at 66.)  Mr. Jacobs testified that because of his bad credit his

bank would not loan him the money to purchase the home if his name was on the title. (Tr. at

65.)  However, according to Mr. Jacobs, the bank insisted that both he and his wife sign the note

and the mortgage. (Tr. at 65.)  On May 24, 2002, the couple refinanced the property and became

_____

piercing action in this case.

[8]Mr. Jacobs was unsure of whether the vehicle was a 2001 or 2002 Mercedes and he was
unsure of the model. (Tr. at 85–86.)

signatories to a 30-year mortgage for $595,000. (Tr. at 66.) According to Mr. Jacobs, the total

current mortgage indebtedness is approximately $660,000. (Tr. at 66.) Mr. Jacobs has made all

of the mortgage payments on the property. (Tr. at 68.) The total fair market value of the home is

approximately $800,000. (Tr. at 69.) Monthly mortgage payments on the property, including

taxes and insurance, comes to approximately $4,500 per month. (Tr. at 69.) However, Mr.

Jacobs claims that no equity exists in the home. (Tr. at 68–69.)

Mr. and Mrs. Jacobs are also members of the Amelia Island Plantation Club where they

frequently dine and entertain.  From March 1999 to June 2003, the couple spent a total of

$71,578.88 at the club. (Gov. Ex. 30.) The payments for the use of the club total approximately

$1,491 per month. (Tr. at 79.) At trial, Mr. Jacobs testified that entertaining at the club was

primarily a business expense, however, while testifying at a Rule 2004 examination,[9] he

described the expenses as personal in nature. (Tr. at 81–82.) Mr. Jacobs also plays golf at the

club at least once a week. (Tr. at 82.) His green fees, which are $20 per game, are subsidized in

part by his wife's membership dues for the club, which Mr. Jacobs pays, and which run

approximately $250 per month. (Tr. at 83.)

## C.

In addition to the above mentioned transactions, Mr. Jacobs made the following transfers

to family members and various philanthropic organizations:

- spent $20,000 on his wife's elective cosmetic surgery in 2000 (Tr. at 84–85);

---

[9]The phrase "Rule 2004 examination" is simply shorthand for a deposition or other examination conducted pursuant to Federal Rule of Bankruptcy Procedure 2004.

- donated $12,152 in 2000 and 2001 to the charity "Place of Encouragement" (Tr. 87–88), which the Debtor testified is a charitable corporation that he founded several years ago.  According to Mr. Jacobs, these donations were made to help pay off $26,000 in overdue property taxes owed by the charity (not Mr. Jacobs individually) because he "didn't search the title" when his client "gave" him the building without telling him that taxes were owed on it (Tr. 88–89)[10];

- transferred a "couple thousand bucks" in donations to the Preservation Institute of Nantucket, which provided him annual trips to Massachusetts to give lectures on historic preservation (Tr. at 86–87);

- donated between $500 and $1,000 per month to the Amelia Island Chapel from 1996 to 2003 (Tr. at 93);

- made an intra-family gift of $3,000 in May 2003 to his adult daughter Allison, a practicing attorney in Boston, to help pay her student loans (Tr. at 89–90);

- made an intra-family transfer of $5,000 to his adult son Craig to purchase a truck and for two years after made payments of $450 a month on the truck (Tr. 90-91);

- made an intra-family transfer of $6,200 for his son Jason's college expenses (not tuition) (Tr. at 91–92);

- made an intra-family transfer of $3,000 to his daughter Jennifer to help her purchase a house (Tr. at 92);

- made an intra-family transfer of $1,000 to his adult son-in-law Jake Abernathy

---

[10]This explanation seems remarkable considering that Mr. Jacobs is a real estate attorney with over 24 years of experience.

upon his graduation from medical school (Tr. at 93).

## D.

On July 15, 2003, Mr. Jacobs filed a petition for relief under Chapter 7 of the Bankruptcy Code. The Bankruptcy Court entered an Order on January 8, 2004, granting Mr. Jacobs a discharge. Thereafter, Mr. Jacobs filed an adversary proceeding to determine the dischargeability of his income tax liabilities for the years in question. After a bench trial held in August, 2004, the Bankruptcy Court entered its Findings of Fact and Conclusions of Law, along with a separate Judgment, on January 24, 2005,[11] holding that Mr. Jacobs' personal tax liabilities were not excepted from the discharge under 11 U.S.C. § 523(a)(1)(C).

The United States now appeals the Bankruptcy Court's decision. The issue before this Court is whether the Bankruptcy Court erred in finding that Mr. Jacobs did not "willfully attempt[] in any manner to evade or defeat" his tax obligations, thereby allowing him to discharge his tax liability.

---

[11]Both the Bankruptcy Court's Findings of Fact and Conclusions of Law and Judgment are dated January 24, 2004.

**Discussion and Analysis**

**II.**

**A.**

This Court possesses jurisdiction over the present appeal pursuant to 28 U.S.C. § 158(a). This Court reviews the Bankruptcy Court's factual findings under the clearly erroneous standard. General Trading Inc. v. Yale Materials Handling Corp., 119 F.3d 1485, 1494 (11th Cir. 1997). In contrast, conclusions of law are reviewed *de novo*. Id.

A debtor filing a petition under Chapter 7 of the Bankruptcy Code is generally granted a discharge of all debts arising prepetition. 11 U.S.C. § 727(b). The general equitable and economic policy reasoning behind this is to provide a "fresh start" to the "honest but unfortunate debtor," whose debts have rendered him, her, or it, incapable of being an active good-faith market participant, by releasing the debtor from further liability for old debts. See Grogan v. Garner, 498 U.S. 279, 286–87 (1991); see also Local Loan v. Hunt, 292 U.S. 234 (1934); see generally Robert K. Rasmussen, An Essay on Optimal Bankruptcy Rules and Social Justice, 1994 U. ILL. L. REV. 1 (1994); Thomas H. Jackson, The Fresh Start Policy in Bankruptcy Law, 98 HARV. L. REV. 1393 (1985). While it is self evident that Bankruptcy law's chief aim is to provide relief to unfortunate debtors who, despite their best efforts, find themselves drowning beneath a rising sea of debts, a corollary to this proposition is that Bankruptcy law was never intended to serve as a shelter to those "who, despite their own misconduct, are attempting to preserve a comfortable standard of living at the expense of their creditors." In re Zick, 931 F.2d

1124, 1129 (6th Cir. 1991); In re Jones, 114 B.R. 917 (Bankr. N.D. Ohio 1990).[12] The purpose of

Bankruptcy law is to provide the debtor with a "fresh start" not a "head start." In re Zick, 931

F.2d at 1129; see Lines v. Frederick, 400 U.S. 18, 19–20 (1970).

In line with these overarching policy considerations, Congress has adopted various

exceptions to the dischargeability of debts within the Bankruptcy Code reflecting its conclusion

that the "creditors' interest in recovering full payment of debts in these categories outweigh[s]

the debtors' interest in a complete fresh start." Cohen v. de la Cruz, 523 U.S. 213 (1998) (quoting

Grogan v. Garner, 498 U.S. at 287). Some of these exceptions to discharge were enacted as

punitive measures barring a discharge of liability based on fraud or other nefarious conduct, see,

e.g., 11 U.S.C. § 523(a)(2)(A) (barring discharge of all liability arising from attaining money,

credit, or services by fraud), while others serve a prophylactic function shielding the general

public from bearing particular economic and social costs. See e.g., 11 U.S.C. § 523(a)(5)

(preventing discharge of spousal and child support obligations). At issue in this case, is the

exception to discharge found in § 523(a)(1)(C), which provides, in relevant part:

(a) A discharge under § 727 . . . of this title does not discharge an individual from

---

[12]While not relying on recent Congressional action in the disposition of this case, it is worth noting that Congress has recently enacted legislation reaffirming this broad policy goal. Specifically, on October 17, 2005, as a reaction to what it perceived as abuses to the Bankruptcy system, particularly on account of affluent debtors seeking to discharge debts through Chapter 7 while taking advantage of various provisions of federal and state law to protect their assets, Congress enacted the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23 (codified in scattered sections of 11 U.S.C.). One of the major features of BAPCPA is what is referred to as "means testing," which aims to force debtors who are capable of paying a pro-rata share of their obligations to creditors to file under Chapter 13 by making them ineligible to file for protection under Chapter 7. See CRS Report for Congress, Apr. 21, 2005, http://www.bna.com/webwatch/bankruptcycrs.pdf#search=%22means%20testing%20bankruptcy%20%22 (last visited August 23, 2006). This feature of BAPCPA is codified at 11 U.S.C. § 707.

any debt—

    (1) for a tax or a customs duty—

        (C) with respect to which the debtor made a fraudulent
        return or willfully attempted in any manner to evade or
        defeat such tax.

11 U.S.C. § 523(a)(1)(C). This exception serves both functions. On one hand it serves a

punitive function in that it prevents a debtor from discharging liabilities arising from conduct

which is willful or would otherwise be actionable as a criminal offense, see 26 U.S.C. § 7201

("Any person who willfully attempts in any manner to evade or defeat any tax imposed by this

title, or the payment thereof, shall . . . be guilty of a felony"), and on the other hand, it prevents a

debtor from in essence shifting its own tax liabilities upon the shoulders of other taxpayers. See

Alamo Nat'l Bank v. Comm'r, 95 F.2d 622, 623 (5th Cir. 1938) ("the Commissioner in effect

represents the interests of all other taxpayers who must bear what the particular taxpayer unjustly

escapes"). The government bears the burden to prove by a preponderance of the evidence that a

debt is nondischargeable pursuant to § 523(a)(1)(C). In re Griffith, 206 F.3d 1389, 1396 (11th

Cir. 2000).

    The United States concedes that Mr. Jacobs filed accurate tax returns. Accordingly, this

Court is only concerned with the second part of § 523(a)(1)(C), which applies to debtors who

"willfully attempted in any manner to evade or defeat" their income taxes.

    Exceptions to discharge, such as § 523(a)(1)(C), are to be strictly construed in favor of

the debtor. In re Fretz, 244 F.3d 1323, 1327 (11th Cir. 2001); In re Griffith, 206 F.3d at 1396; In

re Fegeley, 118 F.3d 979, 983 (3d Cir. 1997); Dalton v. IRS, 77 F.3d 1297, 1300 (10th Cir.

1996). This general rule of construction, however, does not allow or require "that an

unambiguous provision be construed contrary to the plain meaning of its terms." In re Fretz, 244 F.3d at 1327. In the main, straightforward, unambiguous language found in the Bankruptcy Code, like in other statutes, must be interpreted according to its plain meaning. Id.; see United States v. McLymont, 45 F.3d 400, 401 (11th Cir. 1999) ("[T]he plain meaning of the statute controls unless the language is ambiguous or leads to absurd results."); Consolidated Bank, N.A. v. United States Dep't of Treasury, 118 F.3d 1461, 1464 (11th Cir. 1997) ("In the absence of a statutory definition of a term, we look to the common usage of words for their meaning."). But see Howard Delivery Serv., Inc. v. Zurich American Ins. Co., 126 S.Ct. 2105 (2006) (holding that in bankruptcy cases involving interpretation of priority distribution provisions, courts must not only consider the plain meaning of the statute, but must also consider the purpose for the legislative enactment and Bankruptcy law's overriding objective of providing equal distribution amongst creditors). The plain text of the second prong of § 523(a)(1)(C) provides: (1) a conduct requirement (that the debtor "attempted in any manner to evade or defeat [a] tax"); and (2) a mental state requirement (that the attempt to evade or defeat was done "willfully"). In re Fretz, 244 F.3d at 1327; see also In re Birkenstock, 87 F.3d 947, 951 (7th Cir. 1996). The Court will consider these requirements in turn.

## B.

As a starting point, Courts have construed the language "attempted in any manner to evade or defeat [a] tax" broadly in light of the fact that "Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define lest its effort to do so result in some unexpected limitation." Dalton v. IRS, 77 F.3d at

1301 (quoting <u>Spies v. United States</u>, 317 U.S. 492, 499 (1943)).  Accordingly, to give effect to

the plain meaning of the statute and its overarching policy goal, this Court must consider a broad

universe of possible acts that would have the effect of "evad[ing] or defeat[ing] [a] tax."  <u>See</u> <u>In</u>

<u>re Fegeley</u>, 118 F.3d at 984 (finding that acts of omission such as failing to file tax returns can

satisfy the conduct element of § 523(a)(1)(C)); <u>In re Klayman</u>, 333 B.R. 695, 699 (Bankr. E.D.

Pa. 2005) (finding that affirmative acts include: placing assets in the name of others; dealing in

currency; causing receipts to be paid through and in the name of others; and causing debts to be

paid through and in the name of others); 4 Lawrence P. King, <u>Collier on Bankruptcy</u> ¶ 523.07[4]

(15th ed. 2005) (commenting that the broad universe of affirmative acts cognizable under ¶

523(a)(1)(C) include: "concealing of assets, dealing in cash, shielding income and otherwise

frustrating various tax collection efforts where the debtor clearly knows that attempts to collect

the tax are being made.  Nonpayment of taxes coupled with affirmative acts to avoid payment or

collection of taxes can be sufficient to render the tax debt nondischargeable.").

　　　　Mr. Jacobs argues that he never "attempted to evade or defeat" the taxes assessed against

him.  Instead, he asserts that he filed accurate tax returns each year and that he merely failed to

pay his taxes, and that fact alone is insufficient to render his tax liabilities nondischargeable for

purposes of § 523(a)(1)(C).  Accordingly, Mr. Jacobs seeks refuge in the Eleventh Circuit's

holding in <u>In re Haas</u>, 48 F.3d 1153 (11th Cir. 1995).  There, the Eleventh Circuit held that

failing to pay one's tax debts was not enough to satisfy § 523(a)(1)(C)'s conduct requirement. <u>Id.</u>

at 1158.  However, although nonpayment of taxes is not by itself sufficient to satisfy the conduct

requirement of § 523(a)(1)(C), it is "relevant evidence which . . . should [be] consider[ed] in the

totality of conduct to determine whether or not the debtor willfully attempted to evade or defeat

taxes." In re Fretz, 244 F.3d at 1328 (citing In re Fegely, 118 F.3d at 983).   Most other Circuits

which have since examined the issue have essentially agreed with this holding. In re Fegely, 118

F.3d at 983; In re Birkenstock, 87 F.3d at 951; Dalton v. IRS, 77 F.3d at 1301.  But see In re

Bruner, 55 F.3d 195, 200 (5th Cir. 1995) (rejecting Haas and finding that "the fact that a person

would not be a felon for simple non-payment of tax under the Internal Revenue Code does not

persuade us that when a person 'willfully attempts to evade or defeat' a tax by non-payment, it

must be dischargeable in bankruptcy.").

The Haas court went further, however, and held that § 523(a)(1)(C) only applied to acts to

"evade or defeat" the assessment of taxes, and did not cover attempts to evade or defeat the

payment or collection of taxes.  In re Haas, 48 F.3d at 1159.  After much criticism from other

circuits, see, e.g., In re Birkenstock, 87 F.3d at 951–52, the Eleventh Circuit eventually

overturned that part of the Haas ruling finding that acts to frustrate and evade the assessment and

collection of taxes are also included within the scope of § 523(a)(1)(C).  In re Griffith, 206 F.3d

1389 (11th Cir. 2000) (en banc), cert. denied, 531 U.S. 826 (2000).

Griffith, concerned a debtor who had failed to pay his taxes but did not attempt to evade

or defeat a tax assessment.  The debtor did, however, transfer numerous assets to himself and his

wife as tenants by the entireties while facing mounting tax debts and tax collection efforts.  Id. at

1391.  The debtor also transferred assets to a corporation, of which his wife was the sole

shareholder, thereby shedding any ownership interest he held in those assets. Id.  Recognizing

that to allow such conduct would frustrate the balance of providing a "fresh start" to debtors and

a general policy to prevent tax evasion, the Eleventh Circuit held that § 523(a)(1)(C) renders tax

debts nondischargeable where a debtor attempts to evade the payment of a tax, and not just the

assessment of the tax. Id. at 1395.

The Eleventh Circuit faced a third case involving the application of § 523(a)(1)(C), in In re Fretz, 244 F.3d at 1323. There the Court found that § 523(a)(1)(C) prevented a debtor from discharging his tax liabilities even though there were no affirmative acts to transfer or conceal property, however, there was evidence of culpable omissions on the part of the debtor. Id. Specifically, the debtor had failed to file his tax returns, in addition to failing to pay his tax obligations. Id.

Accordingly, in this Circuit, the conduct requirement of § 523(a)(1)(C) is not satisfied where a debtor has filed accurate tax returns, but has simply failed to pay taxes. In re Haas, 48 F.3d at 1157. The requirement is met, however, where a debtor engages in affirmative acts, such as intra-family transfers with insufficient consideration, in order to avoid payment or collection of taxes. In re Griffith, 206 F.3d at 1393–96. The requirement is also met in cases where there are no affirmative acts, but there is evidence of culpable omissions—including occasions where the debtor has failed to file his taxes and has likewise failed to pay them. In re Fretz, 244 F.3d at 1329 (finding that "acts of culpable omission or acts of commission" satisfy the conduct requirement) (internal citations omitted); accord In re Toti, 24 F.3d 806, 809 (6th Cir. 1994) (finding that a "plain reading of § 523(a)(1)(C) includes both acts of commission and acts of omission").

## C.

The Bankruptcy Court made several errors in its reading and application of § 523(a)(1)(C), and the cases interpreting its language. In its opinion, the Bankruptcy Court initially asserts that the Government must proffer evidence of "actual" evasion, and as support

for this proposition it cites to In re Griffith, 206 F.3d at 1393–94. (Bankr. Order, at 8). However, the term "actual" appears no where in the text of the Griffith opinion. Moreover, in its analysis the Bankruptcy Court attempts to use the adjective "actual" as a limiting modifier to the term "evasion." This application, if not the mere use of the term, flies in the face of the plain meaning of the statute as well as its policy rationale. In 1943, the Supreme Court recognized that the universe of possible acts of commission and omission that a debtor may engage in to evade or defeat a tax is quite broad. See Spies v. United States, 317 U.S. at 499. In accordance with this, Congress inserted the phrase "in any manner" to the text of § 523(a)(1)(C), and the Supreme Court has consistently instructed that courts must not insert artificial barriers that would limit the phrase's broad application. See id. Thus, affirmative acts of commission or omission, which actually or constructively would serve to evade or defeat a tax are sufficient. See id. (refusing to limit the universe of evasive acts or omissions thereby constricting "the scope of the Congressional provision that it may be accomplished 'in any manner.'"). In sum, Griffith stands for the proposition that in addition to providing proof that the debtor has failed to pay his taxes, the government must also proffer some evidence of acts evidencing an attempt "in any manner to evade or defeat a tax." 206 F.3d at 1395–96. The Fretz court went further and explained that acts of omission are also sufficient. 244 F.3d at 1329. Accordingly, this Court rejects the Bankruptcy Court's attempt to engraft such evidentiary limitations to the application of § 523(a)(1)(C).

In other parts of its opinion, the Bankruptcy Court again seeks to recast and limit the applicable test in determining whether the debtor engaged in conduct sufficient to render his tax debts nondischargeable. The Bankruptcy Court accurately recognized that a debtor's nonpayment of his tax obligations while having the ability to do so, although not dispositive, is a

significant factor in determining whether a debtor evaded his taxes. (Bankr. Order, at 10.)

However, the Court found that what was required to meet the "conduct" test was a finding that

not only did the debtor fail to pay his taxes although capable of doing so, but a showing that the

debtor "engaged in a fraudulent scheme." (Bankr. Order, at 10.)  In order to prove what would

constitute a "fraudulent scheme" the Bankruptcy Court required that the United States proffer

evidence of acts "of fraud or evidence that the Plaintiff concealed or transferred assets while

maintaining control over the property." (Bankr. Order, at 10.)

As support for this proposition, the Bankruptcy Court cited <u>Landi v. United States</u>, 316

B.R. 363 (Bankr. M.D. Fla. 2004), and <u>In re Griffith</u>, 206 F.3d at 1389.  In <u>Landi</u>, the District

Court found that the debtors' tax debts were nondischargeable because the debtors had used a

professional corporation to shield their assets from the IRS. 316 B.R. at 370.  The debtors also

knowingly claimed withholding credits against their income, while knowing that the corporation

was not paying the corresponding taxes. <u>Id.</u>  Plus, the debtors failed to pay their taxes while still

maintaining a lavish lifestyle. <u>Id.</u>  The <u>Landi</u> court acknowledged the facts of that case

demonstrated that the debtors had "embarked on an elaborate willful scheme to not live up to the

obligations of paying their taxes." <u>Id.</u>  The court in <u>Landi</u> never made the proclamation, however,

that the government must prove a "fraudulent scheme" in order to render tax debts

nondischargeable.  The <u>Landi</u> court was merely acknowledging that the evidence before it in that

particular case demonstrated that an "elaborate scheme existed." <u>See</u> <u>id.</u>

The Bankruptcy Court also attempts to use the term "scheme" as connoting a broad and

systematic plan of action, requiring the commission of many acts designed to meet a specific end.

On the surface, this seems correct, however, the "conduct" requirement can be satisfied by

18

showing that the debtor failed to pay his tax obligations and engaged in perhaps just one act of commission or culpable omission. See In re Fretz, 244 F.3d at 1328–29 (finding that tax obligations were nondischargeable where debtor failed to pay taxes and failed to file tax returns).

In addition, the Bankruptcy Court seeks to limit the acts that could comprise such a "scheme." This is done by coupling the noun "scheme" with the adjective "fraudulent." Accordingly, in the Bankruptcy Court's view, in order to satisfy the § 523(a)(1)(C) "conduct" analysis, instead of showing one or more acts of either commission or omission, the government must prove that the debtor embarked on a "fraudulent scheme" to evade or defeat a tax. Id.

Furthermore, the Bankruptcy Court's requirement that the government demonstrate a "fraudulent scheme" impermissibly engrafts a mental state requirement on the "conduct" inquiry. "Fraudulent" is defined as "a knowing misrepresentation, concealment of material fact, or reckless misrepresentation made to induce another to act to his or her detriment." BLACK'S LAW DICTIONARY 670 (7th ed. 1999). In order to constitute "fraud" there must be some degree of intent to perform the action. Put another way, "[t]here must be the physical act plus the mental state for there to be fraud." Federal Deposit Ins. Corp. v. Aetna Casualty & Surety Co., 426 F.2d 729, 737 (5th Cir. 1970); see Arlington Trust Co. v. Hawkeye-Security Ins. Co., 301 F. Supp. 854, 858 (E.D. Va. 1969) (finding that "intent" is necessary element in an action sounding in fraud).

This error is compounded by the fact that the statute already provides that a tax debt is nondischargeable if there is a showing that the debtor "willfully attempted in any manner to evade or defeat [a] tax." This requires a showing that the debtor acted "willfully." In light of this, the cases have concluded that there is a distinct mental state inquiry in addition to the

19

"conduct" analysis. See, e.g., In re Fretz, 244 F.3d at 1327.   As such, the Bankruptcy Court's

requirement that the United States prove a mental state element—that the debtor acted

fraudulently—as part of the conduct inquiry is plain error.

It should also be noted that the Bankruptcy Court's attempt to require a showing of fraud

in the context of § 523(a)(1)(C) has already been rejected in this Circuit.  In Fretz, 244 F.3d at

1330, the Eleventh Circuit adopted the holding of In re Fegeley, 118 F.3d at 984, where the Third

Circuit expressly rejected a debtor's contention that the "willfulness language of § 523(a)(1)(C)

should be interpreted consistently with the criminal provisions of the Internal Revenue Code, and

that 'proof of fraud is a necessary element of [that prong].'"  Id. (alteration in original).

Therefore, no showing of fraud is necessary in the "mental state" inquiry, and it would simply be

nonsensical to apply a higher mental state standard to the "conduct" inquiry where mental state is

irrelevant.  The Bankruptcy Court's attempts to create these extra hurdles does great violence to

the statute and to the Eleventh Circuit's jurisprudence in this area and is accordingly rejected.

In addition, in attempting to create its "fraudulent scheme" fiction, the Bankruptcy Court

misreads In re Griffith for the proposition that the dispositive factor in determining whether an

affirmative act of concealment is sufficient for purposes of § 523(a)(1)(C), is that the debtor

retain control over the property. (Bankr. Order, at 10.)  The Griffith court never made such a

ruling.  In fact, the Griffith court pointed out that one of the factors before it which supported a

ruling of nondischargeability was the debtor's act of transferring funds to a third-party

corporation and his "no longer ha[ving] any ownership interest in those assets transferred." 206

F.3d at 1391.

Moreover, even assuming that the particular facts of Griffith presented a debtor who had

somehow retained an ownership interest in all of the property he had transferred, that fact alone should not be read as limiting the broader holding of the case. All that is required to satisfy the "conduct" prong is a showing that the debtor engage in some activity to evade or defeat a tax. In re Fretz, 244 F.3d at 1328–29; In re Griffith, 206 F.3d at 1396–97. Under the Bankruptcy Court's rote and perfunctory reading of Griffith, a debtor could fail to pay his tax obligations and then gift his entire estate to charity or simply choose to pay other creditors, and the tax debt would be nondischargeable so long as he retains no control over the property transferred. While it is agreed that a debtor's act of transferring property to a third-party while retaining control of the property would serve to evade or defeat the tax, gifting or otherwise transferring property to a third-party *without* retaining control of the property would have the same effect of "evading or defeating [the] tax." See In re Gardener, 360 F.3d 551, 557 (6th Cir. 2004) (finding that in order to include the wide range of acts that will satisfy the "conduct" inquiry, the Court shall "cast a wide net"); In re Lynch, 299 B.R. 62 (Bankr. S.D.N.Y. 2003) (finding that debtor's decision to pay other creditors and to engage in other discretionary spending rather than addressing his tax obligations would render tax nondischargeable); United States v. Weiss, 237 B.R. 600, 606 (Bankr. E.D. Pa. 1999) (finding debt nondischargeable "where the debtor chose to pay other creditors and, in lieu of payment on taxes"); cf. In re Griffieth, 209 B.R. 823, 829–31 (Bankr. N.D.N.Y 1996) (dismissing debtor's Chapter 7 case, which was filed almost entirely for purposes of discharging tax debts, as bad faith filing when debtors made discretionary payments in substantial amounts, without any "belt-tightening," to exclusion of payment of tax liabilities).

**D.**

Keeping in mind that when determining whether a debtor's actions fall within the scope §

523(a)(1)(C), courts must not place undue limitations upon the statutory phrase "in any manner"

and must, accordingly, "cast[] the net wide," this Court will now consider whether Mr. Jacobs

engaged in acts of commission or omission sufficient to satisfy the "conduct" analysis.

Appealing the Bankruptcy Court's Order, the United States argues that Mr. Jacobs engaged in

numerous acts to evade or defeat his tax obligations, and that it presented a record sufficient to

satisfy § 523(a)(1)(C)'s conduct requirement by a preponderance of the evidence. This Court

agrees.

Although it is conceded that Mr. Jacobs filed his tax returns and that those returns were

accurate, they were nevertheless chronically late. In fact, in each year in question Mr. Jacobs

requested two extensions giving him until October 15th of the following year to file his income

taxes. Although the IRS granted these extensions, this repeated pattern over many years

evidences affirmative acts on Mr. Jacobs' part to evade both the assessment of the taxes as well

as their payment. See In re Hassan, 301 B.R. 614, 624 (S.D. Fla. 2003) (holding that filing late

tax returns is relevant evidence to determine whether a debt is dischargeable pursuant to §

523(a)(1)(C)).[13]

---

[13]It is relevant to note that the facts of Hassan are somewhat different than the facts presented
here. In Hassan, debtors were granted extensions to file their taxes by October 15th of the
following year. See 301 B.R. at 617–18. The difference is that the debtors in Hassan, unlike Mr.
Jacobs, failed to file their taxes by the extension date in each year. This distinction, however, is
one of degree rather than kind. Over a period of seven years, Mr. Jacobs continually failed to file
his taxes by the April 15th deadline and the IRS granted him not one, but two extensions during
each of those years. While Mr. Jacobs availed himself of the IRS's lenity in the face of his

In addition, after filing his taxes Mr. Jacobs simply failed to pay them. During the years in question, Mr. Jacobs had a gross income exceeding $2 million, however, he failed to pay his tax obligations which came to approximately $375,000 (absent penalties and interest), or approximately 18.5% of his gross income. Although he subsequently paid approximately $200,000 towards his tax obligations, he still owes well over $600,000 in taxes, penalties, and interest. As the Eleventh Circuit has recognized, this failure to pay, although not dispositive as to the "conduct" inquiry, is relevant evidence that "should be considered in the totality" of the circumstances to determine whether the "conduct" requirement has been met. In re Fretz, 244 F.3d at 1328; In re Fegeley, 118 F.3d at 983.

Mr. Jacobs also made numerous intra-family transfers. For instance, he gifted $3,000 to his adult daughter, who is a practicing attorney in Boston, to help her pay off student loans. He paid $5,000 to his son Craig in order to help him purchase a truck and continued to make payments on the truck. He gifted $6,200 to his son Jason for college expenses, other than tuition and fees. And he gifted $1,000 to his son-in-law upon his graduation from medical school. Such transfers without adequate consideration in the face of mounting tax debts also provides relevant evidence to meet the "conduct" requirement. See In re Griffith, 206 F.3d at 1393–96.

Mr. Jacobs and Mr. Jacobs' closely held professional associations also made substantial transfers to his wife's business. Although Mrs. Jacobs was president and sole shareholder of Morton-Jacobs Jewelry, Inc., and Mr. Jacobs and his law firms never held any ownership interest in the jewelry store, they nevertheless capitalized and sustained the corporation. Mr. Jacobs

---

chronic procrastination during the course of seven years, his subsequent compliance with the new deadline, while remedying the culpability of the act somewhat, does not completely erase it.

characterized the transfers as "loans," however, there is no real indication that Mr. Jacobs or his firms ever had any expectation of repayment.  Furthermore, notably absent are the standard indicia reflecting that Mr. Jacobs or his firms entered into an arm's length loan with Morton-Jacobs or Mrs. Jacobs.  See In re Official Committee of Unsecured Creditors for Dornier Aviation, Inc. 453 F.3d 225, 233–34 (4th Cir. 2006) (stating relevant factors in determining whether a purported "loan" should actually be recharacterized as an equitable contribution).  At best, the monies transferred to Morton-Jacobs Jewelers and Mrs. Jacobs could be described as equitable contributions to the company.  At bottom, however, these monies were in essence gifts from Mr. Jacobs to his wife allowing her to operate a jewelry business that by no accounts made any money, while at the same time sheltering the funds from tax collection efforts.  See Landi v. United States, 316 B.R. 363 (M.D. Fla. 2004), aff'd, 138 Fed. Appx. 300 (11th Cir. 2005) (Table, No. 04-16005).  This fact is further evidenced by the fact that when Morton-Jacobs Jewelers was sold, Mrs. Jacobs simply pocketed the proceeds from the sale, and also appropriated approximately $11,000 worth of jewelry from its inventory.

Jacobs & Associates, P.A. was also used by Mr. Jacobs to pay for his transportation.  The firm has purchased several vehicles over the years for his personal use, including a $39,137.20 GMC Yukon, and it continues to make monthly payments on the vehicle totaling $756.77 per month.  However, the vehicle is titled in Mrs. Jacobs' name, although Mr. Jacobs is the primary driver of the vehicle.  There is no lease agreement between Mr. and Mrs. Jacobs and the firm.  As such, Mr. Jacobs has used the corporation to pay this debt, and has titled the asset in such a way as to prevent it from being levied upon to pay his tax debts. In re Klayman, 333 B.R. at 702–03 (finding that using a corporation to pay for one's transportation is relevant in the "conduct"

inquiry). Furthermore, Mr. Jacobs failed to satisfactorily explain why he needed to purchase such a high-end vehicle, especially at a time when he was so indebted to the IRS. Id.

Mr. Jacobs also failed to properly report monies earned from his professional associations in all but one of the tax years at issue. In 1994 and 1995, Mr. Jacobs caused his law firm to pay him a salary, but only in 1994 did he cause the firm to make adequate income tax withholdings. In 1995, he directed the firm to pay him a salary, but caused the firm to withhold only $9,362, which was a minor portion of the taxes owed on his total gross income of $233,510. By not properly allocating the over $2 million he earned over the years in question as wages, but rather treating it as non-wage income, Mr. Jacobs disregarded the separation of the two entities. Furthermore, since the professional associations were not required to make withholdings on non-wage income, the United States could not collect taxes by levying on the professional association's account. Essentially, Mr. Jacobs was using what should have been tax withholdings for his own personal spending. See In re Landi, 289 B.R. at 182 (finding that failing to properly report and withhold wage income was a factor in the nondischargeability analysis).

In addition, Jacobs & Associates has made several transfers to Mr. Jacobs characterizing these as "loans" to shareholder. Although Mr. Jacobs later agreed to recharacterize these transfers as income, after being audited by the IRS, these acts nevertheless demonstrate his frequent use of the firm as his own personal piggy-bank, while at the same time using the corporate fiction as a shield behind which to hide assets from tax collection activities. See Landi v. United States, 316 B.R. at 370 (finding that using corporation to shield assets from an IRS levy so that it can be used to pay personal expenses is a relevant affirmative act in determining dischargeability of taxes).

Moreover, in 1995, in spite of increasing indebtedness to the IRS, Mr. Jacobs and his wife purchased a luxurious home located in Amelia Island Plantation. Rather than titling the property in his name, however, the property was titled exclusively in Mrs. Jacobs' name. Although his name is not on the title of the property, he is responsible for the mortgage, and makes all mortgage payments. Therefore, although he lives in the home and makes payments on the home, it is titled in such a way as to prevent an IRS lien from attaching to the property. The Third and the Sixth Circuits have instructed that placing property in the name of others in order to frustrate collection efforts made by the IRS is an affirmative act to "evade or defeat [a] tax." See United States v. McGill, 964 F.2d 222, 230 (3d Cir. 1992) (finding that 26 U.S.C. § 7201 defendant attempted to evade or defeat tax when he closed his own bank account and began exclusively using an account solely in his wife's name and a joint account placed in the name of the defendant and another third-party); United States v. Hook, 781 F.2d 1166 (6th Cir. 1986) (affirming 26 U.S.C. § 7201 conviction where defendant bought a house and titled it in his girlfriend's name while the defendant continued to reside there, pay monthly mortgage payments, and make improvements to the home); In re Klayman, 333 B.R. at 700–02 (holding taxes nondischargeable where debtor transferred real property by deeding it to he and his wife as tenants by the entirety preventing the IRS from levying upon the property).

In addition to owning a luxurious home in Amelia Island Plantation, Mr. and Mrs. Jacobs entertain and dine regularly at the Amelia Island Club, spending over $71,000 over the span of four years. The couple also pays $1,491 per month for use of the Club, and Mr. Jacobs patrons the club regularly in order to enjoy his weekly golf game. Mr. Jacobs' lavish spending also includes paying $20,000 for his wife's elective cosmetic surgery, and making large donations to

the following organizations: the Preservation Institute of Nantucket, Place of Encouragement, and the Amelia Island Chapel. Mr. Jacobs also makes a $600 to $700 per month payment on a Mercedes-Benz for his wife's transportion, which is leased solely in Mrs. Jacobs name. This lavish spending in the face of mounting tax debt also demonstrates conduct designed to "evade or defeat [a] tax." See Landi v. United States, 316 B.R. at 370 (deeming taxes nondischargeable because of debtor's "failure to pay estimated taxes or to pay any income taxes with their tax returns, all the while maintaining a lavish lifestyle."); Lynch v. United States, 299 B.R. at 82–83 & n.95 (collecting cases holding that a debtor's decision to engage in lavish spending and purchase luxury items, rather than pay tax obligations, supports a finding that the tax is nondischargeable).

In sum, the record shows as follows: Mr. Jacobs filed chronically late tax returns; he failed to pay his mounting tax obligations; he made many intra-family gifts; he and his closely held professional associations made substantial monetary transfers to his wife's business; he used his firm to pay for his personal transportation; he failed to properly report wage income; he titled property in his wife's name to frustrate tax collection efforts; and he made the decision to engage in outrageously lavish spending while ignoring his tax obligations. Taking these acts in the aggregate they are more than sufficient to satisfy the "conduct" inquiry. In re Fretz, 244 F.3d at 1328; In re Fegeley, 118 F.3d at 983; In re Griffith, 206 F.3d at 1393–96; In re Haas, 48 F.3d at 1157.

## III.

### A.

The next step of the analysis is to determine whether the United States proffered

sufficient evidence to satisfy § 523(a)(1)(C)' s mental state requirement.  Section 523(a)(1)(C)

requires a showing that the debtor acted "willfully," and whether a debtor has "willfully"

attempted to evade a tax is a question of fact which must be determined in light of the totality of

circumstances of the case. In re Spiwak, 285 B.R. 744, 750 (S.D. Fla. 2002); In re Berzon, 145

B.R. 247, 250 (Bankr. N.D. Ill. 1992); see In re Kirk, 98 B.R. 51, 54 (Bankr. M.D. Fla. 1989).  A

debtor's attempts to evade or defeat his tax obligations is considered "willful" for purposes of §

523(a)(1)(C) if it is done "voluntarily, consciously or knowingly, and intentionally." In re Fretz,

244 F.3d at 1330; see also In re Griffith, 206 F.3d at 1396–97; In re Tudisco, 183 F.3d at 133,

137 (2d Cir. 1999); In re Fegeley, 118 F.3d at 984; In re Birkenstock, 87 F.3d at 952; In re

Dalton, 77 F.3d at 1302; In re Toti, 24 F.3d at 809.  Fraudulent intent is not required. In re Fretz,

244 F.3d at 1330 (citing In re Fegeley, 118 F.3d at 984).  To establish the requisite mental state,

the United States must prove that Mr. Jacobs: (1) had a duty to file income tax returns and pay

taxes; (2) he knew that he had such a duty; and (3) he voluntarily and intentionally violated that

duty. In re Fretz, 244 F.3d at 1330; In re Griffith, 206 F.3d at 1396; In re Fegeley, 118 F.3d at

984.  Mr. Jacobs conceded the first two prongs of this test, so they are not at issue in this case.

The third prong, or willfulness component of the mental state requirement, "prevents the

application of the exception to debtors who make inadvertent mistakes, reserving

nondischargeability for those whose efforts to evade tax liability are knowing and deliberate." In

re Fretz, 244 F.3d at 1330 (citing In re Birkenstock, 87 F.3d at 952).

Being that direct evidence of a debtor's intent to evade taxes is rarely available, the United States may prove its case by use of circumstantial evidence of facts consistent with a list of factors and fact patterns developed by centuries of case law. In re Greene, 207 B.R. 21, 24 (Bankr. M.D. Fla. 1997); see Twyne's Case, 3 Co. Rep. 80b, 76 Eng. Rep. 809 (1601). Courts may draw reasonable inferences from these various fact patterns, In re Berzon, 145 B.R. at 250, which are collectively deemed "the badges of fraud." The list includes:

> (1) the recurrence of the understatement of income for more than one tax year; (2) the understatement of income; (3) implausible or inconsistent explanations of behavior; (4) inadequate records; (5) transfer of assets to a family member; (6) transfer for inadequate consideration; (7) transfer that greatly reduced assets subject to IRS execution; (8) transfers were made in the face of serious financial difficulties; and (9) any other conduct that is likely to mislead or conceal.

Id. at 25; Zimmerman v. United States, 204 B.R. 84, 88 (Bankr. M.D. Fla. 1996); Griffith v. United States, 161 B.R. 727, 733 (Bankr. S.D. Fla. 1993); see also Eyler v. Commissioner, 760 F.2d 1129 (11th Cir. 1985).

To be clear, although the factors are called the "badges of fraud," there is no separate requirement that the United States must prove fraud. In re Fegeley, 118 F.3d at 984. Instead, the United States must simply meet the test for "civil willfulness," which is a lesser standard than that of fraud. See id. Use of the badges of fraud is merely an aid in the inquiry and is strictly done by way of illustration rather than limitation. See Spies, 317 U.S. at 499. As such, it is possible that a court could find that a debtor has "willfully" evaded his tax obligations without satisfying any of the factors enumerated by the badges of fraud or without applying the badges at all. See id.; In re Fretz, 244 F.3d at 1330–31 (finding that debtor's attempt to evade taxes were willful without applying badges of fraud); In re Griffith, 206 F.3d at 1396–97 (affirming

bankruptcy court's use of badges of fraud, but failing to require its use in the analysis).

It should also be pointed out that in its Order the Bankruptcy Court acknowledged that the badges of fraud may be used in determining nondischargeability under § 523(a)(1)(C), (Bankr. Order, at 8), however, the Bankruptcy Court erred in applying the badges of fraud to the "conduct" rather than the "mental state" inquiry (Bankr. Order, at 8). As such, the Bankruptcy Court's errors were compounded by analyzing Mr. Jacobs' conduct under an irrelevant standard and matrix of analysis. Furthermore, the Bankruptcy Court failed to apply a useful blueprint of analysis in determining Mr. Jacobs' mental state.

## B.

Mr. Jacobs argues that the United States failed to establish that any badges of fraud exist in the present case and that the United States' best evidence is that he lived a lavish lifestyle. A review of the arguments presented by the United States and the record does not support this contention. In the instant case, many of the enumerated badges of fraud exist.

For starters, Mr. Jacobs' firm made several "loans" to him allowing him to understate his income. Even though he later recharacterized these "loans" as income, it nevertheless demonstrates an intent to evade paying his tax obligations. Mr. Jacobs also improperly reported wage income as non-wage income. Mr. Jacobs failed to adequately explain the need for his firm to purchase a luxury SUV for his personal use. Mr. Jacobs made many intra-family transfers of money without consideration during a time when he was indebted to the IRS in excess of $600,000. He caused his firm to transfer large sums of money in order to capitalize his wife's penurious business. He caused valuable, tangible property to be titled in such a manner as to

thwart attempts by the government to levy upon the property and proffered a dubious explanation for having done so. He also transferred large amounts of money to various charitable organizations and out of the reach of a potential tax levy. Moreover, Mr. Jacobs made large amounts of money and he did not hesitate to spend the money on gifts for his wife and children, an expensive home in his wife's name, a Mercedes-Benz for his wife, his wife's elective cosmetic surgery, entertaining, dining out, and golf. Thus, contrary to his contentions, Mr. Jacobs' actions satisfy many of the enumerated badges of fraud.

In addition, Mr. Jacobs caused his law firm, Arthur I. Jacobs, P.A. to declare Chapter 7 bankruptcy in 1995, largely due to its tax delinquency. Mr. Jacobs himself has now filed Chapter 7 bankruptcy because of failing to pay his taxes, and his current closely held law firm, Jacobs & Associates, P.A., is indebted to the United States for taxes in the amount of $56,000. Although such conduct is not relevant to Mr. Jacobs' character, it is relevant to demonstrate his specific intent to evade tax obligations. Fed. R. Evid. 404(b); United States v. Corbin, 734 F.2d 643, 656 (11th Cir. 1984); In re Hassan, 301 B.R. 614, 624 (S.D. Fla. 2003).[14]

Notwithstanding this factual showing, the Bankruptcy Court concluded that the United States failed to prove its case. This decision was principally based on the fact that Mr. Jacobs "portrayed a remorseful debtor with a *white heart*" (Bankr. Order, at 8) (emphasis added), and that this fact was demonstrated by his filing accurate tax returns each year, and that he paid approximately $200,000 of his nearly $800,000 tax obligation during the years of 1990 through 1998 (Bankr. Order, at 8). Based on the record in this case, the Bankruptcy Court's conclusion is

---

[14]Mr. Jacobs failed to object to use of this evidence at trial and the Bankruptcy Court explicitly referred to it in its Findings of Fact and Conclusions of Law.

clearly erroneous.[15]

Instead of portraying a debtor with a "white heart," Mr. Jacobs' actions demonstrate a heart similar to that of the debtor in Hassan. There, the court noted that the debtor had made large transfers of assets to his family, had filed a previous Chapter 7 bankruptcy, and had spent large amounts of money in order to provide he and his family a life of luxury all the while ignoring his tax obligations. 301 B.R. at 624. After examining these facts, the Hassan court found it an unescapable conclusion that the debtor had "willfully" evaded his taxes. Id.

While it is uncontested that Mr. Jacobs filed accurate tax returns each year, they were, however, chronically late. This fact weighs against Mr. Jacobs as evidence of his willful attempt to evade paying his taxes. Id. at 633 (citing In re Binkley, 242 B.R. 728, 733 (M.D. Fla. 1999) (finding that filing tax returns late is evidence, when coupled with other acts, of a fraudulent intent)). Furthermore, Mr. Jacobs' attempt to pay $200,000 of a tax debt estimated to be approximately $800,000, or less than twenty-five percent of his outstanding tax obligation, is insufficient to rebut the government's case. Especially given the fact that in Hassan the debtor had attempted to pay $226,220.65 of an estimated $569,575.94, or approximately *forty-five percent*, of his outstanding tax debt, and the court nevertheless deemed his tax obligations nondischargeable. Id. at 616.

There is also no evidence that Mr. Jacobs' failure to pay his taxes was a result of inadvertence or mistake. For his part, Mr. Jacobs represents that he is remorseful of the fact that he did not pay his taxes. While it is commendable that Mr. Jacobs feels some contrition that he

---

[15]Based on the record of this case, it seems that Mr. Jacobs would have even satisfied the Bankruptcy Court's more stringent "fraudulent scheme" test.

has failed to satisfy his legal obligations to the United States for over a decade while at the same time living a life of opulence and excess, that is nevertheless an unsatisfactory explanation for his affirmative choice to willfully engage in acts to evade and defeat his tax obligations. Mr. Jacobs is a sophisticated and experienced real estate and transactional attorney who certainly knew the consequences of his actions when he engaged in them. Put bluntly, Mr. Jacobs had a duty to pay his taxes, knew that he had such a duty, and intentionally violated this duty. Accordingly, Mr. Jacobs will not be permitted to manipulate the Bankruptcy Code as a means of gaining a "head start" at the expense of the United States Treasury.

In sum, after applying the badges of fraud and examining other relevant evidence available in the record, this Court finds that Mr. Jacobs voluntarily and intentionally violated his duty to fulfill his tax obligations. Under these circumstances, the Bankruptcy Court's finding that Mr. Jacobs did not willfully attempt to evade or defeat his tax liability is clearly erroneous.

## IV.

For the reasons stated above, this Court holds that Mr. Jacobs' tax liabilities for the years in question fall within the scope of 11 U.S.C. § 523(a)(1)(C), and are therefore, nondischargeable under the Bankruptcy Code.

Accordingly, it is hereby:

**ORDERED AND ADJUDGED THAT:**

1. The Bankruptcy Court's Findings of Fact and Conclusions of Law and Final Judgment discharging the Appellee's tax liabilities for the years 1990 through 1995, and 1997 and 1998 is **REVERSED**.

2. The Clerk of Court shall enter Judgment in favor of the Government.

3. The Clerk of Court shall close this case.

**DONE AND ORDERED** at Jacksonville, Florida this 19th day of September, 2006.

HARVEY E. SCHLESINGER
United States District Judge

Copies to:

Paul I Perez, Esq., United States Attorney
Bruce T. Russell, Esq., U.S.D.O.J., Tax Division
Ronald Bergwerk, Esq.